UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANAHID GEORGE,<br><br>  Plaintiff,<br><br>v.<br><br>NANCY A. BERRYHILL, Acting Commissioner of Social Security,[1]<br><br>  Defendant. | **1:16-cv-00335-GSA**<br><br>**ORDER DIRECTING ENTRY OF JUDGMENT IN FAVOR OF DEFENDANT NANCY BERRYHILL, ACTING COMMISSIONER OF SOCIAL SECURITY, AND AGAINST PLAINTIFF ANAHID GEORGE** |

**I.    INTRODUCTION**

Plaintiff, Anahid George ("Plaintiff"), seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying her application for Disability Insurance Benefits ("DIB") pursuant to Title II of the Social Security Act. The matter

---

[1] Pursuant to Fed. R. Civ. Pro. 25(d), Nancy A. Berryhill shall be substituted in for Carolyn W. Colvin, as Nancy A. Berryhill is now the acting Commissioner of Social Security.

1

is currently before the Court on the parties' briefs which were submitted without oral argument to the Honorable Gary S. Austin, United States Magistrate Judge.[2] (*See,* Docs. 16, 19, and 20). Upon a review of the entire record, the Court finds that the ALJ applied the proper standards and the decision is supported by substantial evidence. Accordingly, the Court affirms the agency's disability determination and denies Plaintiff's appeal.

## II.  FACTS AND PRIOR PROCEEDINGS[3]

The parties agree that the Plaintiff properly exhausted her administrative remedies and that the Appeals Council denied Plaintiff's appeal. Therefore, this appeal is a review of Administrative Law Judge Cynthia Floyd's ("ALJ") decision issued on August 29, 2014, which is considered the Commissioner's final order. *See*, 42 U.S.C. §§ 405(g), 1383(c)(3). AR 15-23.

### A. Plaintiff's Claims and Issues Presented

Plaintiff argues that the ALJ failed to properly evaluate the medical evidence. Specifically, she contends that the ALJ improperly rejected the opinion of Dr. Lance Portnoff, a consultative neuropsychologist, and improperly relied on the state agency doctors' findings. Plaintiff also asserts that the ALJ's credibility determination was not proper.[4] Plaintiff requests that the Court award benefits, or alternatively, that the case be remanded for a proper evaluation of the medical record. (Doc. 16, pgs. 5-16; Doc. 20, pgs. 3-8). The Commissioner argues that the ALJ's rejection of Dr. Portnoff's opinions was proper, and that the ALJ did not err in her credibility determination. (Doc. 19, pgs. 16-29). As such, the ALJ's decision should be affirmed.

### B. Summary of the Medical Record

The Court has reviewed the entire medical record and will be referenced where appropriate. AR 278-569.

#### 1. *Plaintiff's Physical Impairments*

Plaintiff was seen by Dr. Melvin Helm at the California Headache and Balance Center on

---

[2] The parties consented to the jurisdiction of the United States Magistrate Judge. (*See* Docs. 7 and 8).

[3] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

[4]4 Plaintiff also argues that the ALJ erred at step four when finding Plaintiff could perform her past work. (Doc. 16, pg. 10-11). However, she concedes that any error is harmless because the ALJ identified alternative jobs at step-five. Therefore, the Court need not address this argument. *See, Molina v. Astrue*, 674 F. 3d 1104, 1115 (9th Cir. 2012) (An ALJ's error is harmless where it is "inconsequential to the ultimate nondisability determination.")

December 2, 2011, for complaints of severe headaches and vertigo. AR 528-529. Plaintiff underwent an MRI of her brain on December 8, 2011, in response to her complaints. AR 311. This scan detected a "nonspecific white matter lesion," but did not suggest an acute cerebral infarction or other abnormal processes. AR 311.

She began physical therapy at San Joaquin Rehabilitation beginning December 7, 2011. AR 531-534. She attended six treatment sessions and cancelled five sessions due to consistent high blood pressure that made it unsafe to exercise. At the last session on January 11, 2012, most of Plaintiff's symptoms and problems had resolved but subsequently seemed to re-emerge due to high blood pressure. AR 531

On January 19, 2012, Dr. Dickran Gulesserian, M.D., Plaintiff's treating cardiologist, performed a cardiac catherization at Saint Agnes Hospital in response to her complaints of chest discomfort and shortness of breath. AR 343-344. The catherization found that Plaintiff's left ventricular functioning, aorta, and coronary arteries were normal. AR 344.

Plaintiff underwent an esophagogastroduodenoscopy ("EGD") on January 26, 2012, after complaints of stomach problems. AR 357-358. The EGD found "minimal scattered tiny whitish spots" and a two-centimeter hiatal hernia but was "otherwise negative." A physical examination also performed at that time was "essentially normal." AR 358.

On January 26, 2012, Plaintiff had an x-ray of her cervical spine after she complained of neck pain and numbness. AR 278. This scan detected "severe" facet arthropathy (degenerative changes of the joints of the spine) at the C7-TI level, mild neural foraminal stenosis (narrowing of the nerve passageways in the spine) at the C4-C5 and C5-C6 levels, and multilevel degenerative changes, with the most severe changes at the C5-C6 and C6-C7 levels. AR 278.

A March 23, 2012 MRI of Plaintiff's cervical spine detected multilevel degenerative changes and neural foraminal narrowing and "grade 1 anterolisthesis" (mild vertebral slippage) of the C7-T1 vertebrae. AR 366-367. This scan did not find evidence of spinal canal stenosis. AR 366-367. No abnormal signs of the spinal cord were identified. AR 367. Plaintiff underwent an x-ray of her lumbar spine on May 26, 2012, which found "mild to moderate degenerative disc changes," but no evidence of fracture was identified. AR 395.

Plaintiff met again with Dr. Melvin Helm, M.D., on January 30 and March 9, 2012, with continuing complaints of neck pain and vertigo. AR 514-515; 521-522. Plaintiff had full 5/5

strength in her extremities and normal gait, coordination, and cranial nerve functioning during these visits. AR 514-515; 521-522. Dr. Helm noted that Plaintiff was fully oriented and had normal language function. AR 514; 521. Dr. Helm also noted that an upper extremity nerve conduction study detected "mild median nerve entrapment," but he stated that this finding probably did not explain her alleged sensory symptoms in her upper extremities. AR 514.

Dr. Rohit Sundrani, M.D., performed a cardiac consultation on April 9, 2012. AR 299-300. Dr. Sundrani noted that Plaintiff had normal heart sounds, with no evidence of murmurs or gallops. AR 300. Plaintiff had no neurological or musculoskeletal abnormalities. AR 300. An electrocardiogram ("EKG") found that Plaintiff had normal sinus rhythm, and an echocardiogram detected normal left ventricular functioning and no evidence of pulmonary hypertension. AR 300; 302. Dr. Sundrani described a six-minute walk test that Plaintiff completed as "not bad." AR 300. Dr. Sundrani also observed that Plaintiff had a history of unremarkable angiograms. AR 300.

Dr. Fariba Vesali, M.D., performed a consultative neurological evaluation on August 28, 2012. AR 423-426; 509-512. Plaintiff reported that she had headaches and radiating lower back pain. AR 423. She also alleged that she did not perform any household chores, including cooking, shopping, or driving, and that watching television was her hobby. AR 423. Dr. Vesali reported that Plaintiff brought a walker to the examination, but noted that Plaintiff did not have a prescription for a walker, and she was able to walk without an assistive device. AR 423-424.

During the examination, Plaintiff spoke fluently with full sentences and was able to hear and answer questions appropriately. AR 424. Plaintiff was unable to identify the date of the consultative evaluation, but she knew the name of the President of the United States. AR 424. Plaintiff was able to get on and off the examination table and pick up a paperclip from the table without difficulty. AR 424. Dr. Vesali observed that Plaintiff had full 5/5 strength and normal coordination and reflexes, normal grip strength, and normal muscle bulk and tone. AR 425. Plaintiff had negative straight leg raise testing in the seated position. AR 424-425. She also had decreased sensation on the left side of the face and on the left extremities; Plaintiff's cranial nerves were otherwise normal. AR 425-426. Plaintiff had no tenderness or inflammation in her extremities. AR 425.

Following her examination, Dr. Vesali concluded that Plaintiff could walk, stand, and sit

for six hours in an eight-hour workday with normal breaks and that she could lift up to twenty-five pounds frequently and fifty pounds occasionally. AR 426. Dr. Vesali found that Plaintiff did not need an assistive device for ambulation and opined that Plaintiff could perform postural activities and manipulative activities frequently. AR 426.

Dr. Roger Fast, M.D., a non-examining state agency physician, evaluated Plaintiff's physical impairments on October 8, 2012. AR 68-69; 72-73. Following a review of the medical records, Dr. Fast concluded that Plaintiff could lift twenty-five pounds frequently and fifty pounds occasionally; she could sit for about six hours; and stand/walk for about six hours in a normal eight-hour workday. AR 72. Dr. Fast supported his conclusions by noting that Plaintiff had full strength and positive Waddell's signs[5] at her consultative neurological evaluation. AR 72. Dr. Fast also noted that Plaintiff brought a walker to her consultative neurological evaluation that was not medically necessary as per Dr. Vesali. AR 72. Dr. I.J. Newton, M.D., affirmed Dr. Fast's conclusions about Plaintiff's physical limitations on April 17, 2013. AR 98; 101-102.

Plaintiff had outpatient treatment visits with Dr. Gulesserian between January 2012 and February 2014. During a January 23, 2012 appointment, Dr. Gulesserian noted that Plaintiff's (then) recent cardiac catherization was "completely normal"; he also noted that Plaintiff alleged experiencing gastrointestinal symptoms. He stopped all of her medications due to side effects and noted he would re-evaluate after Plaintiff had an endoscopy. AR 470.

During the February and March 2012 visits, Dr. Gulesserian observed that Plaintiff's blood pressure was elevated and he adjusted medications after Plaintiff had reactions to several different prescriptions. AR 467-469. Plaintiff reported experiencing neck pain and he recommended acupuncture to alleviate it and possibility to address Plaintiff's blood pressure. AR 469. In subsequent appointments, it was noted that Plaintiff's attempts at treatment with acupuncture made her condition worse. AR 468.

On April 26, 2012, Dr. Gulesserian indicated Plaintiff's blood pressure was doing better after prescribing 2.5 mg of Bystolic every day. AR 465. He also noted that Plaintiff was experiencing anxiety, which he was going to treat with Xanax. He reported that Plaintiff gets

---

[5] Waddell's signs were developed to identify psychogenic, or nonorganic manifestations of pain in patients that have heightened emotional effects on their conditions. They have also been associated with detecting malingering in patients with complaints of lower back pain. http://www.physica-pedia.com/Waddells-Sign (Last visited August 3, 2017).

short of breath easily and opined that she could no longer work. AR 465.

At a May 23, 2012, visit, Plaintiff complained of radiating lower back pain. Plaintiff's husband indicated that the pain was likely caused because Plaintiff was "constantly doing work around the house and straining herself." AR 464. On May 31, 2012, she reported severe pain in her right leg. Plaintiff was taken to the hospital which revealed sciatic nerve inflammation. She was given exercises to do and was referred to physical therapy. AR 463.

Plaintiff participated in physical therapy during July 2012 at Optimal Rehabilitation. AR 407-412. She was diagnosed with symptoms consistent with degenerative joint dysfunction with peripheral symptoms into her bilateral extremities. AR 411. Plaintiff reported feeling better at the conclusion of the four sessions. AR 410.

Plaintiff's condition was stable for the next several months with only minimal reports of gastrointestinal symptoms and some tingling and anxiety. AR 461-462. After a November 29, 2012 visit, Dr. Gulesserian reported that Pristiq (an antidepressant) "helped" Plaintiff's depression. AR 457. Dr. Gulesserian noted that Plaintiff's blood pressure was "well controlled," but reported that Plaintiff had complaints of sciatica. AR 457.

On December 17, 2012, Dr. Gulesserian completed a questionnaire regarding Plaintiff's work-related limitations. AR 441-443. He opined that Plaintiff could lift and carry less than ten pounds frequently and ten pounds occasionally; she could sit for three hours; stand for ten minutes; and walk for five minutes in a normal eight-hour workday. AR 441-442. Aside from balancing, handling, and fingering occasionally, Dr. Gulesserian concluded that Plaintiff was incapable of performing postural or manipulative activities. AR 442. Dr. Gulesserian also concluded that Plaintiff would miss about one day of work per month due to her impairments. AR 443.

On January 10, 2013, Dr. Gulesserian noted that Plaintiff's depression "improved with Pristiq." AR 455. Plaintiff also reported that her back-related complaints were "not as bad as they used to be." AR 457. During a March 13, 2013 visit, Dr. Gulesserian again noted that Pristiq was "helping with the depression," and he advised Plaintiff get out of the house and "do things outdoors." AR 561. On July 10 2013, Plaintiff reported an extreme headache which caused dizziness which lasted for four to five hours. She also reported hip pain and a stinging sensation in her left foot. AR 555.

On October 10, 2013, Dr. Gulesserian noted that Plaintiff could not work due to "constant pain in between her back and legs and headaches." Plaintiff presented with high blood pressure and a rapid heart rate and reported that she was still experiencing depression. Dr. Gulesserian prescribed Cymbalta (a prescription medication used for fibroymyalgia). AR 552.

On November 12, 2013, Dr. Gulesserian noted that the majority of Plaintiff's symptoms "ha[d] resolved" with the use of Cymbalta, but her blood pressure was still high. AR 549. On January 23, 2014, Dr. Gulesserian reported that Plaintiff was "doing well" with Cymbalta and that Plaintiff's hypertension was "well-controlled." AR 544. On February 24, 2014, Dr. Gulesserian noted that Cymbalta was "working fine" for Plaintiff, but that Plaintiff had complaints of restless leg syndrome and back soreness. AR 541.

Plaintiff saw Dr. Ben Rand, M.D. two times in May and June 2014. AR 564-565. In June 2014, Plaintiff reported back pain and body aches and requested refills of her medications. The doctor diagnosed her with a history hypertension, lumbago, fibromyalgia, and migraines. AR 565. Her medications at the time included Imitrex, Motrin, Cymbalta, Soma, Pristiq, Hydralezine, and Zolpidem. AR 565.

### 2. *Plaintiff's Psychological and Cognitive Impairments*

Dr. Lance Portnoff, Ph.D., performed a consultative psychological evaluation on August 10, 2012. AR 415-420; 502-507. During the evaluation, Plaintiff alleged that she experienced vertigo, hand tremors, weakness, headaches, and problems with thinking and memory. AR 415. She also complained of depression, panic attacks, hallucinations, and passive suicidal ideation. AR 415-16. Plaintiff reported that she required physical assistance to attend to her personal care and that she was unable to manage her finances, prepare meals, or travel independently. AR 416.

Dr. Portnoff noted that Plaintiff exhibited "adequate" concentration, persistence, and pace during the consultative psychological evaluation. AR 416. He also reported that Plaintiff exhibited weakness in her left leg; psychomotor slowing; "[s]ome involuntary movements," reduced facial kinetics; "quiet and sparse" speech; "moderately impoverished and concrete" thought processes; and that her receptive language comprehension was "grossly intact." AR 417.

Plaintiff denied experiencing hallucinations and suicidal ideation. AR 417. She was fully oriented and had intact immediate and past memory. AR 417. Plaintiff was able to recall two out of three words after several minutes. AR 417. She had limitations in her concentration, her

ability to perform calculations, abstract thinking, and judgment. AR 417-418. Plaintiff was unable to identify the President of the United States or the Statue of Liberty, and she could not state how many eggs were in a dozen. AR 417. Dr. Portnoff also noted that Plaintiff exhibited dysmetria (inability to properly direct or limit motions), agraphesthesia (difficulty recognizing a written number or letter traced on the skin), and motor impulsivity. AR 418.

Dr. Portnoff diagnosed Plaintiff with major depressive disorder and a cognitive disorder. AR 418. He noted that Plaintiff's prior head CT scan was normal, but concluded that Plaintiff's presentation including left hemiparesis (one-sided weakness), and expressive speech limitations suggested that she experienced a cerebrovascular accident. AR 418. Dr. Portnoff stated that Plaintiff's symptoms of depression "probably" contributed to her cognitive deficits, but were "not primarily responsible for them." AR 419. He indicated that Plaintiff's prognosis for her depressive disorder was fair-to-good, and that her prognosis for her cognitive disorder was fair, but would depend upon whether she had future infarcts and the actual extent of the encephalopathy (brain injury). AR 419.

Given Plaintiff's limitations, Dr. Portnoff concluded that Plaintiff was able to perform simple and repetitive tasks. AR 419. However, he concluded that Plaintiff was "moderately impaired" in her ability to accept instructions from supervisors; maintain regular attendance in the workplace; and deal with stress encountered in a competitive work environment. AR 419. Dr. Portnoff also concluded that Plaintiff was "markedly impaired" in her ability to perform detailed and complex task; interact with coworkers and the public; work on a consistent basis without special or additional instruction; and complete a normal workday and workweek without interruptions from a psychiatric condition. AR 419.

On September 28, 2012, Dr. P.M. Balson, M.D., a non-examining state agency doctor, reviewed the medical record. AR 67-71; 73-74. Dr. Balson concluded that Plaintiff could perform simple repetitive tasks. AR 69-70. In doing so, Dr. Balson discussed Dr. Portnoff's August 2012 conclusions regarding Plaintiff's functional limitations and questioned the credibility of his opinion. AR 69. Specifically, Dr. Balson noted that Dr. Portnoff's conclusions about Plaintiff's mental limitations were "not validated" by Dr. Vesali's consultative examination, Plaintiff's other medical data, and the observations of an agency employee who assisted Plaintiff with filling out her disability claim. AR 68-69.

On April 15, 2013, Dr. Jan Jacobson, Ph.D., a non-examining state agency psychologist reviewed the medical record and affirmed Dr. Balson's conclusion that Plaintiff could perform simple repetitive tasks. AR 98-110; 102-104. Dr. Jacobson also noted that Plaintiff was moderately limited in her ability to: 1) carry detailed instructions; 2) maintain attention and concentration for extended periods; and 3) complete a normal workday and workweek without interruptions from psychologically based symptoms. AR 98-100; 102-104. To support her opinion, Dr. Jacobson noted that Plaintiff reported an improvement in her depression with medication. AR 98-99. She also noted that Dr. Portnoff's opinion was not supported by the entirety of the record, and that the opinion was an over-estimate of the severity of Plaintiff's limitations. AR 104.

### C. Evidence Related to Plaintiff's Credibility

#### *1. Prior to the Administrative Hearing*

On May 2, 2012, an agency employee met with Plaintiff as she filed her DIB claim. AR 196-198. Following a face-to-face interview with Plaintiff, the agency employee reported that Plaintiff "seemed fine" and "walked without any problem." AR 197. Specifically, the agency employee noted that Plaintiff "answered all questions without problems, and that Plaintiff had no difficulty reading, understanding, concentrating, talking, sitting, standing, using her hands, or writing. AR 197.

#### *2. Hearing Testimony*

At the hearing on July 11, 2014, Plaintiff testified that she was unable to work due to back pain, symptoms of vertigo, migraine headaches, depression, and fibromyalgia. AR 41. She indicated that her pain was "[b]etween nine and ten" without the use of pain medication and "about five, six" with pain medication. AR 42-43. She reported that her blood pressure was uncontrolled, but that Cymbalta helped her fibromyalgia-related symptoms. AR 45.

With regard to her psychological condition, Plaintiff testified that she had no history of inpatient psychiatric treatment. She denied receiving any outpatient psychiatric counseling, stating, "I don't feel like to going [to] see psychotherapist. I don't know if it is going to help or not." AR 48.

During a typical day, Plaintiff sits and watches the news on television. AR 49. She occasionally washes dishes, but does not perform other household chores. AR 50. Plaintiff stated

9

that she does not have any hobbies. AR 49. She is able to lift (or carry) less than five pounds, stand for about five minutes, and sit for about twenty to thirty minutes at any given time. AR 51-52. She further testified that she could stand for one to two hours, and sit for about an hour to one half hour in a normal eight-hour workday. AR 51-52.

### III. THE DISABILITY STANDARD

To qualify for benefits under the Social Security Act, a plaintiff must establish that he or she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 1382c(a)(3)(A). An individual shall be considered to have a disability only if:

> . . . his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.
> 42 U.S.C. § 1382c(a)(3)(B).

To achieve uniformity in the decision-making process, the Commissioner has established a sequential five-step process for evaluating a claimant's alleged disability. 20 C.F.R. § 404.1520(a). The ALJ proceeds through the steps and stops upon reaching a dispositive finding that the claimant is or is not disabled. 20 C.F.R. § 404.1520(a)(4). The ALJ must consider objective medical evidence and opinion testimony. 20 C.F.R. § 404.1513.

Specifically, the ALJ is required to determine: (1) whether a claimant engaged in substantial gainful activity during the period of alleged disability; (2) whether the claimant had medically-determinable "severe" impairments; (3) whether these impairments meet or are medically equivalent to one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) whether the claimant retained the residual functional capacity ("RFC") to perform his past relevant work; and (5) whether the claimant had the ability to perform other jobs existing in significant numbers at the regional and national level. 20 C.F.R. § 404.1520(a)(4).

### IV. SUMMARY OF THE ALJ'S DECISION

Using the Social Security Administration's five-step sequential evaluation process, the

ALJ determined that Plaintiff was insured through December 31, 2016, and that Plaintiff had not engaged in substantial gainful activity since January 12, 2012, the alleged onset date. AR 15. At step two, the ALJ identified the following severe impairments: fibromyalgia, migraine headaches, chronic headaches, degenerative disc disease with cervical spondylosis, lumbar spine degenerative changes with peripheral symptoms, bilateral leg degenerative joint disease, restless leg syndrome, hypertension, major depressive disorder, and cognitive disorder (not otherwise specified). AR 15. At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listing impairments in 20 C.F.R. Part 404 P, Appendix 1. AR 15. As part of her analysis, the ALJ found that Plaintiff's statements regarding the intensity, persistence, and limiting effects of her alleged symptoms were not entirely credible.

The ALJ also determined that Plaintiff had the RFC to perform a restricted range of medium work. AR 17. Specifically, the ALJ found Plaintiff could lift/carry up to fifty pounds occasionally and twenty-five pounds frequently; she could sit, stand, and walk for up to six hours in an eight hour work day; she could frequently climb ramps and stairs, but never ladders, ropes or scaffolds; she must avoid concentrated exposure to unprotected heights and fast moving machinery or even slippery terrain; and she was able to perform simple routine tasks. AR 17.

At step four, the ALJ found Plaintiff could perform her past relevant work as a casher II and counter supplies worker. AR 23. Alternatively, at step five, the ALJ also concluded that other jobs existed in significant numbers in the national economy that Plaintiff could perform, including a patient transporter, linen room attendant, and stubber. AR 24. The ALJ therefore concluded Plaintiff was not disabled. AR 25.

## V.    THE STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), this Court reviews the Commissioner's decision to determine whether (1) it is supported by substantial evidence, and (2) it applies the correct legal standards. *See Carmickle v. Commissioner*, 533 F.3d 1155, 1159 (9th Cir. 2008); *Hoopai v. Astrue*, 499 F.3d 1071, 1074 (9th Cir. 2007).

"Substantial evidence means more than a scintilla but less than a preponderance." *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002). It is "relevant evidence which, considering the record as a whole, a reasonable person might accept as adequate to support a

conclusion." *Id.* Where the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld." *Id*.

## VI. DISCUSSION

### A. The ALJ's Evaluation of the Medical Evidence was Proper.

Plaintiff argues that the ALJ improperly rejected Dr. Portnoff's opinion because she did not provide specific and legitimate reasons for doing so, and misconstrued Plaintiff's mental limitations. (Doc. 16, pgs. 7-10). The Commissioner contends that the ALJ's reasons for rejecting the opinion are specific and legitimate and her findings are supported by the record and constitute substantial evidence. (Doc. 19, pgs. 16-20).

#### *1. Legal Standard*

The weight given to medical opinions depends in part on whether they are offered by treating, examining, or non-examining (reviewing) professionals. *Holohan v. Massanari*, 246 F.3d 1195, 1201 (9th Cir. 2001); *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). "When there is conflicting medical evidence, the Secretary must determine credibility and resolve the conflict." *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir.1992). When doing so, an ALJ may reject the uncontradicted opinion of a treating or examining medical professional only for "clear and convincing" reasons. *Ghanim v. Colvin*, 763 F. 3d 1154, 1161 (9th Cir. 2014); *Lester*, 81 F.3d at 831. In contrast, a contradicted opinion of a treating or examining professional may be rejected for "specific and legitimate" reasons. *Ghanim*, 763 F. 3d at 1161; *Lester*, 81 F.3d at 830. The opinions of non-treating or non-examining physicians may serve as substantial evidence when the opinions are consistent with independent clinical findings or other evidence in the record. *Thomas,* 278 F. 3d at 957. Such independent reasons may include laboratory test results or contrary reports from examining physicians, and plaintiff's testimony when it conflicts with the treating physician's opinion. *Leste*r, 81 F.3d at 831, *citing Magallanes*, 881 F.2d at 751–55.

Here, when evaluating the medical evidence, the ALJ gave substantial weight to Dr. Jan Jacobson's (a non-examining state psychologist) and Dr. Portnoff's (a consultatitve examining neuropsychologist) opinions that Plaintiff could perform simple repetitive tasks. AR 21. However, she gave little weight to the rest of Dr. Portnoff's opinion. Because there were contradictory medical opinions, the ALJ needed to state specific and legitimate reasons for rejecting Dr. Portnoff's findings. *Ghanim*, 763 at 1161; *Lester*, 81 F.3d at 830. The ALJ did so

in this case.

### a. The ALJ's Rejection of Dr. Portnoff's Opinion is Supported by Substantial Evidence and the Decision Applied the Proper Correct Legal Standards.

The ALJ summarized the records related to Plaintiff' mental impairments. AR; 21-22. She stated the following with regard to Dr. Portnoff's decision:

> Dr. Portnoff conducted a detailed psychological evaluation of the claimant, finding the claimant capable of performing simple repetitive tasks, with additional limitations. To the extent of the ability to perform simple repetitive tasks, substantial weight is accorded [to] his opinion. The undersigned gives limited weight to the rest of the doctor's opinion. The evidence shows the claimant was reporting improvement on her medications. Furthermore, the doctor's opinion is internally inconsistent. In one place he said the claimant demonstrated adequate concentration, persistence, and pace; later he said she exhibited deficits in concentration. The terms the doctor used in assessing the claimant (moderate and marked) are undefined.
>
> Psychologist Jan Jacobson of the [s]tate agency reviewed the claimant's medical records regarding mental impairments and concluded the claimant was capable of understanding, remembering, and carrying out very short and simple instructions. The opinion of Dr. Jacobson of limiting claimant to performing simple repetitive tasks is given substantial weight. It is supported by the diagnostic impressions and clinical data in Dr. Portnoff's report and conservative treatment, which according to her medication list consists of a prescription for Pristiq 50 mg daily for depression. Thus, the claimant's allegations concerning mental impairment are partially credible.
> AR 21 (citations omitted).

Thus, the ALJ rejected Dr. Portnoff's report because Plaintiff showed some improvement with medications; she only received conservative treatment; Dr. Portnoff's opinion contained inconsistencies regarding Plaintiff's ability to concentrate; and, there were no definitions of moderate and marked limitations contained in the report. AR 21. The ALJ also relied on Dr. Jacobson's opinion because it was supported by the medical record and the findings in Dr. Portnoff's report. AR 21.

As a preliminary issue, the Commissioner appears to concede that the ALJ's reliance on Dr. Portnoff's failure to define moderate and marked as a basis to reject the opinion was error, therefore, the Court need not address this issue. (Doc. 19, n. 4). Additionally, the Court agrees with the Commissioner that the error is harmless because the ALJ provided other specific and legitimate reasons for rejecting Dr. Portnoff's opinion, and therefore the decision is free of legal

error. *Molina*, 674 F. 3d at 1115 (An ALJ's error is harmless where it is "inconsequential to the ultimate nondisability determination.")

      First, a review of Dr. Portnoff's report reveals that it does contain an inconsistency regarding Plaintiff's ability to concentrate. One the one hand, Dr. Portnoff indicates that Plaintiff exhibited "adequate" concentration, persistence, and pace during the consultative psychological evaluation, but he later indicated that she had deficits in concentration. AR 21; 416; 418. Inconsistencies with the overall record or with a physician's own notes is a specific and legitimate reason to reject a physician's opinion. *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005) (rejecting physician opinion where physician's "other recorded observations and opinions" contradicted his ultimate conclusions); *Roberts v. Shalala*, 66 F.3d 179, 184 (9th Cir. 1995) (rejection of examining psychologist's functional assessment which conflicted with his own written report and test results).

      Plaintiff argues that the inconsistencies in Dr. Portnoff's report was a Scrivener's error because all other parts of the report demonstrated significant concentration deficits. Although Plaintiff offers this alternative explanation for the doctor's findings, this Court must defer to the ALJ's interpretation of the evidence if it is reasonable, as it is here. The ALJ is responsible for resolving conflicts and weighing the medical evidence. *See Gutierrez v. Comm'r of Soc. Sec.*, 740 F.3d 519, 523 (9th Cir. 2014) ("The court must consider the record as a whole and weigh 'both the evidence that supports and the evidence that detracts from the ALJ's' factual conclusions" and "'[i]f the evidence can reasonably support either affirming or reversing,' the reviewing court 'may not substitute its judgment' for that of the Commissioner"); *Thomas v. Barnhart*, 278 F.3d at 954 (Where the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld.)

      Moreover, the other two reasons articulated by the ALJ – that Plaintiff received conservative treatment and that her depression improved with medication – are also specific and legitimate reasons for rejecting Dr. Portnoff's opinion. Here, after Dr. Portnoff's examination, Plaintiff began taking Pristiq and Cymbalta. AR 455; 549; 552; 561. She received no other treatment for her depression (such as counseling), but her depression improved nevertheless. AR 48; 455; 549; 552; 561. Therefore, improvement in her condition that occurred after Dr. Portnoff's report is supported by the record and is a legitimate reason for rejecting Dr. Portnoff's

14

opinions. The Court is unpersuaded by Plaintiff's argument that the ALJ's reliance on improvement in her depression is not a legitimate basis to reject Dr. Portnoff's opinion because Dr. Portnoff explicitly stated that while Plaintiff's depression contributes to her cognitive deficits, it is not primarily responsible for them. AR 419. The fact that Dr. Portnoff acknowledged that Plaintiff's depression "probably contributes to her cognitive deficits" sufficiently supports the ALJ's conclusion that improvement in her depression undercut at least some of Dr. Portnoff's conclusions. AR 419; *See*, *Macri v. Chater*, 93 F. 3d 540, 544 (9th Cir. 1996) ("the ALJ is entitled to draw inferences 'logically flowing from the evidence."). Moreover, the ALJ did not ignore Plaintiff's cognitive impairments, as demonstrated by limiting Plaintiff to simple repetitive tasks. AR 17.

Finally, the ALJ 's reliance on Dr. Jacobson's opinion that Plaintiff's depression improved as a basis to reject Dr. Portnoff's opinion is supported by the record. A non-examining physician's opinions "may serve as substantial evidence" to reject an examining physician's opinion "when they are supported by other evidence in the record and are consistent with it." *Morgan v. Comm'r of the Social Sec. Admin.*, 169 F.3d 595, 600 (9th Cir.1999). Here, when reviewing the evidence and formulating her opinion, Dr. Jacobson noted that Plaintiff reported an improvement in her depression with medication. AR 98-99. She also noted that Dr. Portnoff's opinion was not supported by the entirety of the record and that the opinion was an over-estimate of the severity of Plaintiff's limitations. AR 104. In doing so, she incorporated the findings of fact and analysis composed by Dr. Balston who questioned the credibility of Dr. Portnoff's findings. Specifically, Dr. Balston noted that the mental limitations were "not validated" by Dr. Vesali's consultative examination and other medical data in the file, as well as observations of an agency employee who assisted Plaintiff with filing her disability claim did not support Dr. Portnoff's conclusions. AR 68-69; 103-104. Thus, the ALJ's reliance on Dr. Jacobson's opinion was proper since Dr. Jacobson considered other evidence in the medical record as a basis to form her conclusions.

### b. *The ALJ Was Not Required to Further Develop the Record.*

Plaintiff argues that the ALJ should have re-contacted Dr. Portnoff if she had any concerns regarding his opinion. (Doc. 16, pg. 9). However, it is Plaintiff's burden to produce full and complete medical records, not the Commissioner's. *Meanel v. Apfel*, 172 F.3d 1111, 1113

15

(9th Cir. 1999). An ALJ is required to re-contact a doctor only if the doctor's report is ambiguous or insufficient for the ALJ to make a disability determination. 20 C.F.R. §§ 404.1512(e); *Bayliss*, 427 F. 3d at 1217; *Tonapetyan v. Halter*, 242 F.3d at 1150 (holding that ALJs have a duty fully and fairly to develop the record only when the evidence is ambiguous or "the record is inadequate" to allow for proper evaluation of the evidence). Here, the ALJ rejected Dr. Portnoff's conclusions because they were internally inconsistent and were at odds with other medical evidence in the file. AR 21. It is the ALJ's duty is to resolve conflicts in the medical opinions, and she did so by giving less weight to Dr. Portnoff's opinion because she believed it was unsupported and inconsistent with the record as a whole. *See Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995) (where medical opinions differ, "it is then solely the province of the ALJ to resolve the conflict") (citation omitted).

**B. The ALJ Properly Discredited Plaintiff's Subjective Complaints.**

Plaintiff argues that the ALJ's credibility determination was improper because the ALJ did not provide clear and convincing reasons to reject her testimony. (Doc. 16, pgs. 11-16; Doc. 20, pgs. 5-10). The Commissioner contends that the ALJ's credibility determination was proper and the decision is supported by substantial evidence. (Doc.19, pgs. 21-26).

A two-step analysis applies at the administrative level when considering a claimant's credibility. *Treichler v. Comm. of Soc. Sec.*, 775 F. 3d 1090, 1098 (9th Cir. 2014). First, the claimant must produce objective medical evidence of his or her impairment that could reasonably be expected to produce some degree of the symptom or pain alleged. *Id*. If the claimant satisfies the first step and there is no evidence of malingering, the ALJ may reject the claimant's testimony regarding the severity of his or her symptoms only if he or she makes specific findings and provides clear and convincing reasons for doing so. *Id*.; *Brown-Hunter v. Colvin*, 806 F.3d 487, 493 (9th Cir. 2015); SSR 96-7p (ALJ's decision "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and reasons for that weight.").[6] Factors an ALJ may consider include: 1) the

---

[6] Social Security Ruling 96-7p was superseded by Ruling 16-3p, effective March 28, 2016. See 2016 WL 1020935, *1 (March 16, 2016) and 2016 WL 1131509, *1 (March 24, 2016) (correcting SSR 16-3p effective date to read March 28, 2016). Although the second step has previously been termed a credibility determination, recently the Social Security Administration ("SSA") announced that it would no longer assess the "credibility" of an applicant's statements, but would instead focus on determining the "intensity and persistence of [the applicant's] symptoms." See SSR 16-3p, 2016 WL 1020935 at *1 ("We are eliminating the use of the term 'credibility' from our sub-

16

applicant's reputation for truthfulness, prior inconsistent statements or other inconsistent testimony; (2) inconsistencies either in the claimant's testimony or between the claimant's testimony and her conduct; (3) the claimant's daily activities; (4) the claimant's work record; and (5) testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which the claimant complains. *See Thomas v. Barnhart*, 278 F. 3d at 958-959; *Light v. Social Security Administration*, 119 F. 3d 789, 792 (9th Cir. 1997), *see also* 20 C.F.R. § 404.1529(c).

Because the ALJ did not find that Plaintiff was malingering, she was required to provide clear and convincing reasons for rejecting Plaintiff's testimony. *Brown –Hunter*, 806 F. 3d at 493; *Smolen v. Chater*, 80 F.3d 1273, 1283-84 (9th Cir. 1996); *Lester*, 81 F.3d at 834. When there is evidence of an underlying medical impairment, the ALJ may not discredit the claimant's testimony regarding the severity of his or her symptoms solely because they are unsupported by medical evidence. *Bunnell v. Sullivan*, 947 F.2d 341, 343 (9th Cir. 1991); SSR 96-7. Moreover, general findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints. *Brown-Hunter*, 806 F. 3d at 493.

Plaintiff alleged that she was unable to work due to physical and mental conditions. When discrediting Plaintiff's credibility, the ALJ noted the objective medical evidence did not support Plaintiff's statements. Specifically, the ALJ noted that Plaintiff's heart work-up and

---

regulatory policy, as our regulations do not use this term. In doing so, we clarify that subjective symptom evaluation is not an examination of an individual's character."). Social Security Rulings reflect the SSA's official interpretation of pertinent statutes, regulations, and policies. 20 C.F.R. § 402.35(b)(1). Although they "do not carry the force of law," Social Security Rulings "are binding on all components of the [SSA]" and are entitled to deference if they are "consistent with the Social Security Act and regulations." 20 C.F.R. § 402.35(b)(1); *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1224 (9th Cir. 2009) (citations and quotation marks omitted).

As the Ninth Circuit recently acknowledged, SSR 16-3p "makes clear what our precedent already required: that assessments of an individual's testimony by an ALJ are designed to 'evaluate the intensity and persistence of symptoms after [the ALJ] find[s] that the individual has a medically determinable impairment(s) that could reasonably be expected to produce those symptoms,' and not to delve into wide-ranging scrutiny of the claimant's character and apparent truthfulness." *Trevizo, v. Berryhill*, 862 F. 3d 987, 995 n.5 (9th Cir. 2017) *see also Cole v. Colvin*, 831 F.3d 411, 412 (7th Cir. 2016) (Posner, J.) ("The change in wording is meant to clarify that administrative law judges aren't in the business of impeaching claimants' character; obviously administrative law judges will continue to assess the credibility of pain assertions by applicants, especially as such assertions often cannot be either credited or rejected on the basis of medical evidence.") SSR 16-3p became effective after the issuance of the ALJ's decision and the Appeals Council denied review in the instant case. It is unclear whether SSR 16-3 applies retroactively. However, the applicability of SSR 16-3p need not be resolved here since the ALJ's evaluation of Plaintiff's subjective complaints in this case meets the guidelines set forth in both SSR 16-3p and its predecessor, SSR 96-7p.

esophagogastroduodenoscopy were normal (AR 22-23; 358), and she demonstrated only mild degenerative disc disease. AR 366-367. She also only had mild deficits in her lumbar spine and no deficits in her cervical spine. AR 366-367; 395. Reliance on these facts is permissible as a lack of objective evidence is a clear and convincing reason to reject a claimant's testimony. See 20 C.F.R.§ 404.1529(c)(2) ("Objective medical evidence … is a useful indicator to assist us in making reasonable conclusions about the intensity and persistence of your symptoms …."); *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001) ("While subjective pain testimony cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence, the medical evidence is still a relevant factor in determining the severity of the claimant's pain and its disabling effects").

Relatedly, the ALJ also properly noted that Plaintiff's fibromyalgia complaints were controlled with Cymbalta which is supported by the record. AR 23; 541; 544, *Warre v. Com'r of Soc. Sec.*, 439 F. 3d 1001, 1005 (9th Cir. 2006) (impairment amenable to control is not disabling). The ALJ also noted that Plaintiff never received mental health treatment from a specialist to treat her depression, which is also supported by the record and is a valid basis to find Plaintiff not credible. AR 23; 48. *Molina v. Astrue*, 674 F.3d at 1112 (an ALJ may consider an unexplained or inadequately explained failure to seek treatment when evaluating credibility) (citing *Tommasetti v. Astrue*, 533 F.3d 1035,1039 (9th Cir. 2008); *Burch v. Barnhart*, 400 F.3d 676, 681(9th Cir. 2005) ("The ALJ is permitted to consider lack of treatment in his credibility determination").

Finally, the ALJ also referenced inconsistencies between Plaintiff's subjective complaints and the medical record. For example, the ALJ noted that the Plaintiff used a walker to ambulate, however, Dr. Vesali made an explicit finding that Plaintiff did not need an assistive device. AR 23; 423-424. The ALJ also relied on the observations made by a field office employee that Plaintiff walked and answered all of the questions without a problem at the time she completed her application, which undercut her credibility. AR 23; 196-198. Plaintiff argues that the field officer's statements are not a valid basis to discredit her disability claims. (Doc. 16, pg. 14). However, an ALJ may consider inconsistencies between the claimant's testimony and her conduct, or testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which the claimant complains. *See Thomas*, 278 F. 3d at 958-959; *Light*, 119 F. 3d 789, 792 (9th Cir. 1997), *see also* 20 C.F.R. § 404.1529(c)(3) (Evidence submitted by

medical opinions and observations made by our employees are used to evaluate symptoms). Here, the field officer made observations that contradicted the severity of Plaintiff's impairments. Therefore, the ALJ did not err when considering this information.

Plaintiff also cites *Soto-Olarte v. Holder*, 555 F. 3d 1089 (9th Cir. 2009) for the premise that the ALJ should have confronted her with the field officer's statements and given her an opportunity to explain them. (Doc. 16, pgs. 14-15). However, the reliance on *Soto-Olarte* is misplaced as it is an immigration case, and social security law does not impose a confrontation requirement. *Bayliss*, 427 F.3d at 1218 n. 4. This proposition has been upheld in numerous district courts in the Ninth Circuit that have addressed this issue. *See*, *Milosevich v. Colvin*, 2016 WL 738420, at *4 (C.D. Cal. Feb. 23, 2016) citing *Mulay v. Colvin*, 2015 WL 1823261, at *6 (C.D. Cal. Apr. 22, 2015) (court rejected the claimant's argument that the ALJ had a duty to seek an explanation for inconsistencies in the record); *see also Amezquita v. Colvin*, 2016 WL 1715163, at *7-8 n. 4 (C.D. Cal. Apr. 28, 2016) (rejecting argument, based on *Soto-Olarte*, that the ALJ had a duty to confront the claimant with inconsistencies in his testimony); *Kocher v. Colvin*, 2015 WL 6956529, at *8 (D. Nev. Sept. 29, 2015); (same); *Montelongo v. Colvin*, 2014 WL 4627245, at *10 (E.D. Cal. Sept. 16, 2014) (same, noting "[a]lthough immigration law is administrative law, it does not apply here").

Given the above, the ALJ provided clear and convincing reasons that are supported by substantial evidence to conclude Plaintiff's subjective symptom testimony was not credible. Here, the ALJ clearly identified what testimony she found not credible and what evidence undermined Plaintiff's complaints. *Brown-Hunter*, 806 F. 3d at 493; *Lester*, 81 F.3d at 834. Although the Plaintiff has offered other interpretations of the evidence regarding her credibility, it is not the role of the Court to re-determine Plaintiff's credibility *de novo*. If the ALJ's finding is supported by substantial evidence, the Court "may not engage in second-guessing." *Thomas*, 278 F.3d at 959. Accordingly, the ALJ's credibility determination was proper.

///
///
///
///
///

///

**VII. CONCLUSION**

Based on the foregoing, the Court finds that the ALJ's decision is supported by substantial evidence and is based on proper legal standards. Accordingly, this Court DENIES Plaintiff's appeal. The Clerk of this Court is DIRECTED to enter judgment in favor of Nancy A. Berryhill, Commissioner of Social Security and against Anahid George, and close this action.

IT IS SO ORDERED.

Dated: **August 6, 2017**            **/s/ Gary S. Austin**
                                     UNITED STATES MAGISTRATE JUDGE